## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 10 2017, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: J.H., Minor Child,<br><br>and<br><br>B.H., Mother,<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | April 10, 2017<br><br>Court of Appeals Case No. 02A05-1609-JT-2159<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Lori K. Morgan, Magistrate<br><br>The Honorable Charles F. Pratt, Judge<br><br>Trial Court Cause No. 02D08-1601-JT-10 |

**Brown, Judge.**

[1] B.H. ("Mother") appeals the involuntary termination of her parental rights with respect to her daughter J.H. Mother raises one issue which we revise and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

## Facts and Procedural History

[2] J.H. was born on March 4, 2003. Mother was convicted of second degree domestic assault in Cape Girardeau, Missouri, in 2007. Mother's probation in that case was revoked in March 2008, she was ordered incarcerated for seven years, and she was released from incarceration on February 19, 2015. In March 2007, a circuit court in Missouri appointed Mother's sister Diana, who lived in Fort Wayne, Indiana, as J.H.'s guardian. J.H. was removed from Diana's care in October 2012 due to concerns of abuse and neglect by Diana and her boyfriend which were later substantiated,[1] J.H. was adjudicated a CHINS in February 2013, and Diana's guardianship was terminated. J.H. was placed in licensed foster care, at YSC for a short time, at Columbus Behavioral Health from October 2013 to August 2014, and at Damar, a residential facility in Indianapolis, in August 2014. Following her release from prison in February 2015, Mother was incarcerated for thirty days from mid-January to mid-February 2016 for stealing and was sentenced to two years of unsupervised

---

[1] Diana and her boyfriend were later convicted on felony neglect charges.

probation. She has not seen J.H. since 2007.

[3] On January 15, 2016, the Indiana Department of Child Services ("DCS") filed a petition for termination of Mother's parental rights as to J.H. On March 22 and May 17, 2016, the court held an evidentiary hearing. Mother testified she was on disability but looking for a job, she receives "SSI and Social Security," "I get 130 on the SSI and then on the big check I get 486 they taking it out for child support," "I draws off of my dad," and, when asked if she had any diagnoses of any health issues, stated "I take psych meds." Transcript at 18-19. She testified that she had lived in her sister's basement following her release from prison in February of 2015 and that she now lives in a two-bedroom house in Cape Girardeau and had been living there since March 4, 2016.

[4] Mother testified that, in addition to her conviction for domestic assault in 2007 and subsequent probation revocation in that case, she had convictions for trespass and theft in 2007 and escape or attempted escape from custody in March 2008. When asked why she was incarcerated in January 2016, Mother answered "[s]omething that I didn't do and my ex-boyfriend did." *Id.* at 22. She indicated the conviction was for stealing, she now has two years of unsupervised probation, and she is currently on probation. She further testified that her sister Diana lives in Fort Wayne, Indiana, Diana obtained guardianship of J.H. in March 2007 because Mother was incarcerated, and the guardianship was later terminated. When asked "since you been out of incarceration since February of 2015 you have not physically seen [J.H.] is that correct," Mother replied "Yes is because I don't have a ride and I just moved in

this place, the new place and I'm just fixing up his room and I'm just trying to get stuff around worked around in this house fixing up stuff" and "so I don't have no way and I've been paying bills so I don't have no money to save back to do nothing . . . and plus I been looking for jobs." *Id.* at 23. When asked if it was accurate that she had not seen J.H. since 2007, Mother answered "[t]hat's right." *Id.*

[5] Mother testified she signed a lease for two years, the landlord had been giving her things to place in the house and sprayed for bugs, she had filled out two job applications, she had a caseworker who "worked with the FCC people next door to the police station and I had got in that program and . . . they pay half of everything, the only thing I have to pay at 109 90 every month," and her housing is through Section 8. *Id.* at 24. She testified "they taking $100 out of [her] check" each month for child support for her other children, she has four children including J.H., that two of the children were placed with her aunt and uncle who have guardianship of them, and that one of her children was fifteen years old and lived in a boys' home in Springfield, Missouri. *Id.* at 24. Mother indicated she did not have a car and just walks, she does not have a driver's license, and her intention is to stay in Cape Girardeau "[c]ause I'm on paper I can't go nowhere." *Id.* at 27.

[6] When asked about her medications, Mother stated "I take a lot of medications," "I've got on of the fifth pill because I have nightmares and . . . I can't sleep all the time and so I've been on that medicine when I was in prison," and "I have to take medicine cause you got to be stay focused when you dealing

with kids too." *Id.* at 28. She indicated she started receiving her social security disability when she was a child, and when asked why she received it, answered "they can give nobody they information cause I went down there ah to the Social Security office . . . and she says she can't give that information out because she said the doctor have to give them . . . permission to give it to them." *Id.* at 29.

[7] When asked about her spending, Mother testified: "I spend my money how I want to I have to pay my bills here and there and my fines," "I got a pay my rent I gotta do this do that I got to make sure this house is clean I got to do all types of stuff going on with that money," and "[t]hat money is not for me to spend," and when asked about her caseworker, she testified "[y]eah that's my caseworker she comes to my house sometimes and visits me sometimes she supposed to have a home visit she look out for me sometime look for me some furniture and stuff I ain't got no furniture yet." *Id.* at 30. When asked if she has an issue with illegal drugs, Mother indicated she did not do drugs. When asked if she ever sent Diana any money or clothes for J.H. while he was in her care, Mother replied "I didn't send Diana nothin," "[c]ause I was locked up," "how could I send her stuff if I was locked up," and "I didn't have nothing myself." *Id.* at 32.

[8] Erin Stresemann, a DCS family case manager in the permanency unit assigned to J.H., ("FCM Stresemann") testified that paternity had not been established for J.H. She stated that J.H. was currently placed in the transitional living unit at Damar, a residential facility in Indianapolis that works with children who

have behavioral issues, developmental delays, and other needs requiring twenty-four hour supervision. She testified J.H. has resided at Damar since August 2014, that she believed he resided at Columbus Behavioral Health, a residential facility, from October 2013 to August 2014, and that prior to October 2013 he had been placed at YSC for a short time and prior to that in licensed foster care. FCM Stresemann testified J.H. was removed from the care of his aunt and guardian Diana in October 2012 and was adjudicated a CHINS in February 2013. She testified she believed J.H. lived with Diana from 2007 to 2012, J.H. was removed because there were "concerns of abuse and neglect which later became substantiated abuse and neglect," the abuse was by Diana and her boyfriend against J.H., and Diana and her boyfriend were both convicted on felony neglect charges.

[9]     FCM Stresemann testified that she first made contact as a case manager with Mother in January 2015 when Mother was in a women's correctional facility in Missouri. She stated that she scheduled a teleconference with Mother for February 2015, she followed up with a letter to tell Mother to contact her when she was released from prison, and she attempted to make contact with Mother after she was released but was not successful until August 2015. FCM Stresemann testified she spoke with Mother in August and September of 2015, Mother advised that she was working with a community agency and described her progress, and Mother told her that she had been living "with a boyfriend in St. Louis Missouri and that he didn't let her call . . . and then he kicked her out." *Id.* at 48. FCM Stresemann testified Mother reported that she lived in her

sister's basement and that her "understanding is that it was on and off because . . . she's given me three other addresses . . . that she's lived at" and "then when I ask her again she . . . said she was living with her sister." *Id.* at 50. FCM Stresemann testified Mother is unemployed and receives disability. When asked if she ever asked Mother if she had any diagnosis, she replied that Mother has not been forthcoming with that information. When asked the last time Mother had communication with J.H., she answered "[m]y understanding the last time was 2007." *Id.* at 52.

[10] When asked how J.H. was doing, FCM Stresemann responded that "he has his good days and bad days," "he's made a lot of progress . . . since he's been there," "because he has been abused and neglected he does have . . . developmental delays and behavioral issues," he struggles sometimes with aggressiveness with staff and other clients, according to his teachers "he's made tremendous progress since he's been there and has had a lot of confidence boosts," and it seems like J.H. "really has improved in . . . a lot of areas since he has been there." *Id.* at 53. When asked if she knew how long J.H. will continue to reside at Damar, she replied that "the goal would be to have him step down to a . . . less restrictive unit" and "then to work at him like being able to go on more day passes," right now he is in his school on site and the goal would be for him to "go to a charter school off-site to see if he could . . . maintain his behavior there," and the goal would be "for him to be able to be in a more family like structure and the possibility . . . to go with an adoptive family." *Id.* She indicated she did not have a timetable when this will be

completed.

[11] FCM Stresemann indicated Mother was placed under a parent participation plan and one of the provisions was that she establish paternity which she did not do. She testified that Mother completed a five-session parenting class, and her understanding was that Mother sought the services on her own. When asked whether Mother inquired about J.H., FCM Stresemann testified "[s]he initially did . . . in conversations that we had but recently like within the last six months she doesn't ask directly about him but she has talked about . . . getting housing for him like she did say that that was her goal," that she spoke with Mother about "how would you do that visiting and she did discuss that she needed to talk with her worker at Community Caring Council . . . to see if she could get assistance with taking a bus down to visit him" in Indiana, and that FCM Stresemann had initiated the conversation about visiting J.H. *Id.* at 56.

[12] When asked why DCS filed a termination petition, FCM Stresemann testified "[i]t was due to [J.H.] being out of the home for . . . I believe . . . over two years" and "he had not had contact with [Mother] in several years since 2007 . . . . and at that point it didn't look like reunification was a possibility." *Id.* at 57. When asked if DCS has a plan for the care and treatment for J.H. should Mother's rights be terminated, FCM Stresemann testified that the plan would be adoptive placement. When asked if it was fair to say that, after eight years in prison, Mother started the process of getting her life back in order, tried to look for appropriate housing, and sought out the assistance of people and services in Cape Girardeau, FCM Stresemann replied affirmatively. When asked "this is

going to be a difficult adoption to accomplish is it not," she responded "I don't know that that's true," "I think like the . . . issue is that there we can't move forward with adoption at this time because with the parents' rights still being intact," "but he really actually has made really good connections with staff there at Damar," "his teacher that's been working with him thinks that he's going to be able to do that," and "there's a lot of hope I think he will be able to be adopted." *Id.* at 69. She testified "the next step would be him to go to charter school," "then we'll see how that would go," and there were several steps left to go. *Id.*

[13] J.H.'s guardian ad litem, Jennifer Young, ("GAL Young") testified that she was appointed at the preliminary inquiry hearing several years previously and had attended a majority of the hearings involving J.H. and made recommendations on his behalf. GAL Young testified that she believed it is in the best interests of J.H. that Mother's parental rights be terminated. When asked why she made that recommendation, GAL Young testified Mother has had little or no contact with J.H. since 2008, the majority of his life; Mother allowed her sister Diana to obtain guardianship of J.H. and admitted Diana was an inappropriate caregiver due to the mental and physical abuse she inflicted upon J.H.; after her February 2015 release, Mother did not make any attempt to contact DCS or seek visitation until August 2015 despite the fact DCS had been trying to contact her and involve her in the case; Mother did not provide any clothing, support, or money to Diana and has not provided anything since this case started; Mother is not taking care of any of her other

children; Mother is unable to say why she receives social security disability; "throughout the case and I'm not a doctor by any means but [Mother] appears to be very low functioning maybe have mental health issues and so I would be concerned about her care for [J.H.] at this time"; and J.H. "is very special needs he's been in residential treatment for quite some time" and is "finally slowly stepping down to a less restricted . . . unit but still has a lot of behavioral issues and needs that . . . I don't feel that [Mother] can care for at this time." *Id.* at 82.

[14] On March 15, 2016, the court entered a judgment of involuntary termination of Mother's parental rights. It found that Mother has not had contact of any type with J.H. since her incarceration in 2007 and concluded that, "[g]iven the established habitual patterns of conduct involving engagement in criminogenic activity, unstable housing, lack of contact with the child and failure to provide materially or financially for the child, the Court finds that there is a substantial probability of future neglect or deprivation" and that DCS has established by clear and convincing evidence that the allegations of the petition are true "in that there is a reasonable probability that the conditions that resulted in the child's removal and the reasons for the placement outside the parent's home will not be remedied, and/or that continuation of the parent/child relationship poses a threat to the wellbeing of the child." Appellant's Appendix at 7. The court further found that termination of Mother's parental rights is in the best interests of J.H. and that DCS has a satisfactory plan for the care and treatment of J.H. which is placement for adoption.

## *Discussion*

The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that

heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[17] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640. We also note that the involuntary termination statute is written in the disjunctive and requires

proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *K.T.K.*, 989 N.E.2d at 1235-1236. A parent's incarceration is an insufficient basis for termination, and there is not a "bright-line rule for when release must occur to maintain parental rights." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643, 648 (Ind. 2015).

[18] Mother argues there is no evidence that she could have predicted that the person she trusted to be the legal guardian of J.H., her own sister, would criminally abuse and neglect J.H. She argues that she finished her prison sentence in February 2015, completed parenting classes, and obtained suitable housing in the form of a two-bedroom home, and consequently that it cannot be said that there is no reasonable probability that the conditions that resulted in J.H.'s removal would not be remedied. She also asserts that, to the extent there is an inference that a continuation of the parent/child relationship poses a threat to the well-being of J.H., there was no showing that J.H. was endangered while in her care. She further contends the evidence does not support the court's determination that termination is in the best interests of J.H., arguing the court failed to consider that she has a suitable two-bedroom home, has completed parenting classes, has sufficient social security income to support the household, and accomplished these things soon after completing an eight-year prison term. She also asserts there has not been a showing that the plan for J.H.'s care and treatment is satisfactory, arguing J.H. remains at Damar, "[t]he

likelihood that he would complete the Damar requirements to allow him to be placed for adoption are problematic at best," and "[w]hy not let a loving mother attempt to parent a child rather than institutionalize him for the foreseeable future." Appellant's Brief at 18.

[19] DCS argues that the court's unchallenged findings support its conclusions and judgment. It points to Mother's criminal history, history of violating her probation, failure to have contact with J.H. since 2007, failure to inquire about his well-being in the six months before the factfinding hearing, housing instability, and apparent mental health issues and unwillingness to disclose her conditions, and to J.H.'s special needs and need for ongoing treatment. DCS argues the court could reasonably infer, given Mother's own mental health issues and J.H.'s special needs, that she would not be able to provide for him. DCS further argues termination is in J.H.'s best interests and that Mother has had no relationship with now thirteen-year-old J.H. since he was placed with Mother's sister when he was about four years old. It also asserts that the court's conclusion that a plan of adoption is satisfactory is not clearly erroneous.

[20] In determining whether the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements

against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.*

[21] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[22] To the extent Mother does not challenge the court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[23] As pointed out by the trial court, Mother's conduct reveals she has a significant

history and pattern of engaging in criminal activity that has prohibited her from providing care for J.H. and working towards reunification with him. J.H. was born in March 2003, and Mother's criminal activity includes second-degree domestic assault in 2007, for which she later, upon the revocation of her probation, served seven years in prison. She was convicted of trespass and theft in 2007, escape or attempted escape in 2008, and stealing in 2016. After she was released from prison on February 19, 2015, she was again incarcerated approximately eleven months later from mid-January to mid-February 2016 and placed on probation for two years. J.H. was initially placed with Mother's sister Diana but was removed following concerns, which were later substantiated, that Diana and her boyfriend abused or neglected him, leading to felony neglect convictions for Diana and her boyfriend. Mother has three other children in addition to J.H. for whom she is not caring. Also as noted by the trial court, Mother is unemployed, does not have a vehicle or driver's license, has lived at several locations since her release from prison and recently in a two-bedroom house with no furniture, and has not provided for J.H. financially or otherwise during her incarceration or after her release. Further, the testimony establishes, and the trial court found, that Mother has not had contact with J.H. since 2007.

[24] In addition, J.H. was placed in the transitional living unit at Damar, has demonstrated developmental delays and behavioral issues, sometimes struggles with aggressiveness with staff and others, and has made tremendous progress and has improved in a lot of areas since his residency at Damar. FCM

Stresemann testified that the goal was for J.H. to move to a less restrictive unit, to attend a school off-site, and to be able to be in a more family-like structure and possibly an adoptive family. GAL Young pointed to the facts that Mother has had little or no contact with J.H. for the majority of his life, did not make any attempt to contact DCS or seek visitation following her release from prison until August 2015 despite the fact DCS had been trying to contact her, did not provide support for J.H., and is not caring for her other children. GAL Young also noted her concerns regarding Mother's health and functioning, J.H.'s needs, and her belief that Mother cannot care for J.H.

[25] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to J.H.'s removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of J.H.

[26] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such

that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. The testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203. Further, adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*.

[27] When asked why DCS filed a termination petition, FCM Stresemann noted the length of time J.H. had been out of the home and had no contact with Mother and testified that it did not look like reunification was a possibility. GAL Young testified that she believed it is in J.H.'s best interests that Mother's rights be terminated and noted the lack of contact between Mother and J.H., the actions or inactions of Mother since her release from prison, her concern about Mother's ability to care for J.H., and J.H.'s needs. While Mother leased a two-bedroom home, completed a parenting class, and receives certain social security payments, the court had the opportunity to review the entirety of the testimony and evidence presented at the evidentiary hearing, including evidence of

Mother's criminal history and incarcerations, the condition and duration of her housing, the transportation and community resources available to her, the extent to which she provides care for her other children, her health, the extent to which Mother had contact or an opportunity to contact J.H. and DCS and did not do so, and J.H.'s health, development, and progress while residing at the transitional living unit at Damar.

[28] Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of J.H. is supported by clear and convincing evidence. Also, the record, including evidence that J.H. has made significant improvements and after certain steps are taken may be adopted, reveals support for the court's determination that adoption is a satisfactory plan for the care and treatment of J.H. *See A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan for adoption was not unsatisfactory), *trans. denied*.

## Conclusion

[29] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[30] Affirmed.

Vaidik, C.J., and Bradford, J., concur.